# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

DON CASEY,                              :
                                        :
              Plaintiff                 :        No. 3:12-CV-02272
                                        :
      vs.                               :        (Judge Nealon)
                                        :
CAROLYN W. COLVIN,[1]                   :
ACTING COMMISSIONER OF                  :
SOCIAL SECURITY,                        :
                                        :
              Defendant                 :

## MEMORANDUM

On November 15, 2012, Plaintiff, Don Casey, filed this appeal[2] under 42 U.S.C. § 405 for

review of the decision of Defendant denying his claim for disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  (Doc. 1).  The parties have fully

briefed the appeal.  For the reasons set forth below, the decision of the Commissioner denying

Plaintiff's application for DIB will be affirmed.

## Background

Plaintiff protectively filed[3] his application for Title II and Title XVI social security

disability insurance benefits on March 2, 2010, and alleged his disability began on October 15,

---

1. Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration
("SSA") on February 14, 2013, and is substituted for Michael J. Astrue as the Defendant in this
case pursuant to Federal Rule of Civil Procedure 25(d).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social
Security Administration denying a claim for social security disability benefits" is "adjudicated as
an appeal."  M.D. Pa. Local Rule 83.40.1.

3. Protective filing is a term for the first time an individual contacts the SSA to file a claim for
benefits.  A protective filing date allows an individual to have an earlier application date than the
date the application is actually signed.

2009. (Tr. 89-90, 153).[4]  The application was initially denied by the Bureau of Disability

Determination[5] on May 11, 2010. (Tr. 91-100).

On June 8, 2010, Plaintiff requested a hearing before an administrative law judge. (Tr.

101). A hearing was held on May 4, 2011 before administrative law judge Sharon Zanotto

("ALJ"), at which Plaintiff and Paul A. Anderson, a vocational expert ("VE"), testified. (Tr. 22-

88). On May 16, 2011, Plaintiff's counsel sent a follow-up letter with arguments for entitlement

to benefits. (Tr. 216-17).  On May 17, 2011, the ALJ issued a decision denying Plaintiff's

application finding, inter alia, that Plaintiff has the residual functional capacity ("RFC") to

perform light work, except that he requires alternating positions at will, and that there are jobs

that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 7-18).

On July 15, 2011, Plaintiff filed a request for review with the Appeals Council. (Tr. 5-6).

On September 28, 2012, the Appeals Council concluded that there was no basis upon which to

grant Plaintiff's request for review. (Tr. 1-4). Thus, the ALJ's May 17, 2011 decision stood as

the final decision of the Commissioner.

Plaintiff filed the instant complaint in this Court on November 15, 2012. (Doc. 1). On

January 24, 2013, Defendant filed an Answer and Transcript from the SSA proceedings. (Docs.

9-10). On April 24, 2013, Plaintiff filed a brief in support of his complaint; on May 16, 2013,

Defendant filed her brief in opposition. (Docs. 13-14). Plaintiff did not file a reply brief, and the

appeal is now ripe for disposition.

---

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of
the Answer on January 24, 2013. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates
applications for disability insurance benefits on behalf of the SSA.

Disability insurance benefits are paid to an individual if that individual is disabled and insured, that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the date last insured. It is undisputed that Plaintiff met the insured status requirements of the SSA through September 30, 2011. (Tr. 156, 164). Plaintiff was born in the United States on November 3, 1962, and at all times relevant was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. (Tr. 36); 20 C.F.R. §§ 404.1563(c).

Plaintiff completed high school and has specialized training in masonry. (Tr. 169). His employment records indicate that he held the following jobs: laborer, mason, and sanitation worker. (Tr. 170, 195). At the May 4, 2011 hearing, the VE noted that Plaintiff's work history is "primarily bricklayer, construction" which is "[h]eavy, skilled," and "some brief periods in the janitorial field" which is "[m]edium, unskilled." (Tr. 81).

Plaintiff asserted that he became disabled on October 15, 2009, while employed as a sanitation worker at the Carlisle Fairgrounds. (Tr. 215). The impetus for his claimed disability is gout. (Tr. 215).

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c). Plaintiff was forty-seven (47) years old at the time of the May 4, 2011 hearing and the time of the ALJ decision. (Tr. 36).

At the May 4, 2011 hearing and in his follow-up letter, Plaintiff's counsel argued that Plaintiff's gouty arthritis diagnosis falls under Listing 1.02, major dysfunction of a joint, thus entitling him to benefits. (Tr. 29, 215). Counsel further argued that his flare-up or outbreak periods, in which Plaintiff is completely unable to work, exceed three (3) days a month, resulting in Plaintiff's inability to sustain work activity on a regular and continuing basis. (Tr. 30-31).

The hearing transcript reveals that the ALJ reviewed Plaintiff's medical records prior to the hearing, was knowledgeable on the symptoms and results of gout, and objectively questioned Plaintiff about his treatment and symptoms. (Tr. 39-69). At the May 4, 2011 hearing, Plaintiff testified that he had been battling gout for the last twenty (20) years and that it has been getting progressively worse. (Tr. 39). He stated that he suffers from extreme gout one (1) to three (3) times a month which causes him to be bedridden, to walk with a limp, or to be unable to close his left hand, for three (3) to five (5) days at a time. (Tr. 39, 64). Plaintiff stated that in October of 2009, he was unable to work two (2) of the Carlisle Production car shows because it required him to stand all day which his gout prevented. (Tr. 42). Upon questioning, Plaintiff testified that in 2010 the only flare-ups that required treatment in the emergency room ("ER") and that completely incapacitated him were in March and November. (Tr. 51). The ALJ questioned Plaintiff about his lack of treatment from January 7, 2008, through September of 2010, despite the alleged disability onset occurring in October of 2009. (Tr. 57-60). Plaintiff testified that he was no longer on medication in 2009 because he had no insurance and could not afford it. (Tr. 70). Plaintiff testified that at the time of the hearing he was having a flare-up, and he

4

demonstrated the swelling in his left hand and his inability to bend or straighten his little finger. (Tr. 72).

At the hearing, the VE testified that due to his symptoms Plaintiff would be unable to perform either of his past jobs because of his exertional and sit-stand limitations, but that there is other work in the economy he could perform, such as a surveillance system monitor, nut sorter, cashier, and parking lot/entertainment industry. (Tr. 82-85). When questioned regarding Plaintiff missing work for periods during his flare-ups, the VE stated that "[n]ormally we say two days per month is permitted," and that some employers would tolerate more missed days and some would not. (Tr. 86). The VE testified that sixty-percent to fifty-percent of the jobs he listed would not tolerate an employee missing three (3) to five (5) work days every two (2) months, and that missing such work with less than two (2) to three (3) months in between would be "more problematic." (Tr. 86-87).

**Medical Records**[7]

On March 6, 2010, Plaintiff was admitted on crutches in mild distress to Carlisle Regional Medical Center and was treated by Cloyd Gatrell, M.D., for pain in multiple areas. (Tr. 235-37, 285-87). Intake forms indicated a twenty-year history of gout treated with Allopurinol and Indomethacin, but that Plaintiff had been out of medications since December and was having a "gradual flare-up of pain in right foot, ankle, knee, and right hand." (Tr. 236, 285). His uric acid levels were abnormal. (Tr. 327). Plaintiff was able to ambulate independently and could

---

7. This summary of the medical records focuses primarily on Plaintiff's gout, which is germane to this appeal.

perform all activities of daily living without assistance. (Tr. 239). The onset of the severe pain (rated 10 out of 10 and treated with a morphine injection) was gradual due to running out of gout medicine in December. (Tr. 239). Radiology tests were conducted of the right hand showing "an old deformity of the distal tuft of the 2nd digit" and "[n]o radiographic evidence of acute bone or soft tissue abnormality [was] visualized." (Tr. 281, 323). The impression given was an acute exacerbation of gout due to medication non-compliance, hypertension due to medication non-compliance, and mild hypokalemia. (Tr. 237, 286). Upon discharge, Plaintiff was instructed to follow up with his primary care physician, Louis A. Hieb, M.D., and was prescribed Prednisone and Colchincine. (Tr. 238 & 287).

Plaintiff walked with a "normal gait" into the Carlisle Regional Medical Center emergency room ("ER") on March 9, 2010 with abdominal pain and saw Laura Crim, M.D., for nausea, vomiting, and diarrhea. (Tr. 223-34 & 290-94). Dr. Crim's impression was gastroenteritis. (Tr. 225, 292).

On April 27, 2010, Plaintiff was evaluated by Mark P. Holencik, D.O., F.A.O.A.O. (Tr. 256). Plaintiff informed he suffered from gout for twenty (20) years in his right big toe at the first metatarsophalangeal ("MTP") joint, but has developed gout in multiple joints including: his right knee, which has been aspirated multiple times and treated with cortisone injections; his right hand at the third MTP joint; and his right heel. (Tr. 256). Plaintiff reported his right knee is "always painful and swollen," and Dr. Holencik found Plaintiff to be "quite honest about his condition and abilities and no way tries to amplify his problem." (Tr. 257). Plaintiff stated he could sit for a few hours and stand for up to an hour when not having "an attack," but he is

6

having a couple of attacks a month and "probably correctly feels that the frequency of those attacks is not compatible with holding down a job both in terms of physical function and attendance." (Tr. 257). Plaintiff noted he first tried Indsin and Allopurinol, but switched to Colchicine daily and Prednisone for flare-ups. (Tr. 257). Plaintiff expressed concerns that he thought he had rheumatoid arthritis and refused to take medication for his blood pressure. (Tr. 257). He reported his last day of work was October of 2009. (Tr. 257). Examination showed the following: difficulty toe walking with a rigid and painful right first MTP joint which is swollen; heal walking was intact; there was no pain from internal rotation of the hips in a seated position; and a "quite tender first MTP joint with virtually no mobility on the right with a normally mobile first MTP on the left." (Tr. 258). There was "clearly a chronic inflammatory process involving the right knee and first MTP joint on the right." (Tr. 258). Dr. Holencik was troubled by Plaintiff's hyperfexia, gout, and increasing flare-ups which "will end up with premature arthritis of his knee." (Tr. 259). Dr. Holencik opined that Plaintiff's diagnosis "would restrict him substantially in any type of ambulatory employment." (Tr. 259).

Dr. Holencik placed the following restrictions on Plaintiff's work capacity: lifting two (2) to three (3) pounds frequently, ten (10) pounds occasionally; carrying two (2) to three (3) pounds frequently, ten (10) pounds occasionally; standing and walking "not to exceed 15 minutes;" sitting (8) hours with alternating sit/stand at his option; pushing/pulling limited in right upper and right lower extremity; occasional bending; and never kneeling, stooping, crouching, balancing or climbing. (Tr. 260-61). Dr. Holencik also noted that the following are affected by Plaintiff's

impairment: reaching, handling, and fingering ("during flare of gout"), and the ability to deal with heights, moving machinery, vibration, temperature extremes, and wetness. (Tr. 261).

On May 6, 2010, a Physical Residual Functional Capacity Assessment was conducted by Candelaria Legaspi, M.D. (Tr. 262-269). Dr. Legaspi ultimately opined that Plaintiff is capable of light work. (Tr. 266). Dr. Legaspi stated that Plaintiff has "issues of non compliance," that "[t]he record reveals that the treatment has generally been successful in controlling those symptoms. Treatment medications are effective when he is taking meds," and Plaintiff "has limited ADLs when he has an acute flare ups [sic], Otherwise [sic] he is able to function in between attacks." (Tr. 269). Dr. Legaspi limited Plaintiff to occasionally lifting/carrying twenty (20) pounds, frequently lifting/carrying ten (10) pounds; standing and/or walking about six (6) hours in an eight-hour workday; sitting about six (6) hours in an eight-hour workday; and unlimited push and/or pull. (Tr. 263). Dr. Legaspi found no environmental limitations, communicative limitations, visual limitations, manipulative (reaching, handling, fingering, feeling) limitations, or postural (climbing, balancing, stooping, kneeling, crouching, crawling) limitations. (Tr. 263-65).

The "DDS[8] Disability Worksheet" indicates that on March 24, 2010, a call was made from the SSA to Sadler Health Clinic Corporation, informing that Plaintiff had not kept any of his scheduled appointments. (Tr. 274).

On July 13, 2010, Plaintiff walked into the Carlisle Regional Medical Center complaining of moderate, sharp pain in the right hand and knee, and was treated by Jean-Paul Romes, M.D.

---

8. Disability Determination Services in Pennsylvania are provided by the BDD. See n.5, supra.

(Tr. 295-296, 324-327).  Plaintiff was seeking a prescription for Prednisone, and the records again noted that he was not taking his medication.  (Tr. 296, 300, 325).  Plaintiff could ambulate independently and could perform all activities of daily living without assistance.  (Tr. 299). Plaintiff rated his pain as a three (3) out of ten (10) and nine (9) out of ten (10) in some areas. (Tr. 299).  The impression given was gout and arthralgia, and Plaintiff was issued prescriptions for Vicodin and Prednisone, was instructed to follow-up with Dr. Hieb, and was discharged.  (Tr. 297, 326).

On July 26, 2010, Plaintiff treated at Sadler Health Center for hypertension and gout and was prescribed Calan SR.  (Tr. 317).  Additionally, his progress notes indicated he received medication at Sadler Health Center on September 16, 2010, on November 10, 2010, on December 21, 2010, on February 21, 2011, on February 24, 2011, and on March 8, 2011.  (Tr. 59, 318).  Additionally, he failed to pick up his medication on October 7, 2010.  (Tr. 59, 318).

On November 2, 2010, Plaintiff walked into Carlisle Regional Medical Center ER to request a refill of his medication, and complained of pain of moderate intensity progressively worsening in his right foot and ankle.  (Tr. 302, 304).  Plaintiff was diagnosed with gout, arthralgia, and essential hypertension, was again prescribed Vicodin and Prednisone, and was instructed to follow up with Dr. Hieb.  (Tr. 303, 305).

On November 9, 2010, Plaintiff was treated by Dr. Hieb at Sadler Health Center.  (Tr. 315-16).  It was noted that for his long history of gout Plaintiff has treated with Allopurinol, Prednisone, and Indocin, and he was seen on November 2, 2010 in the ER for a flare-up.  (Tr. 316).  On examination, there was no acute distress, the gout episodes had pretty much resolved,

and Plaintiff looked "normal." (Tr. 316). He was prescibed Uloric and Cholchicine through a program called HealthyRx.[9] (Tr. 316).

On January 18, 2011, Plaintiff was treated by Dr. Hieb at Sadler Health Center. (Tr. 312-14). It was noted that he had no insurance. (Tr. 313). Plaintiff complained of severe gout, stating that at times he could not walk, but that the Uloric helped somewhat. (Tr. 313). It was also noted that his "girlfriend mentioned that she ha[d] decreased his alcohol a lot and that seem[ed] to have had some impact positively on the gout flares." (Tr. 313). Dr. Hieb believed there was "more than gout going on with his complaint of musculoskeletal problems." (Tr. 313). Dr. Hieb commented that he was "not sure how much of a pain tolerance" Plaintiff had as he complained of severe knee pain even though on examination his knee was mostly normal. (Tr. 313). Regarding Plaintiff's treatment plan, he was advised of a "new PAP program" for the new Colchicine, because although Colchine had helped the gout, it was stopped because it was very expensive. (Tr. 313).

On February 2, 2011, Plaintiff was treated by Dr. Hieb at Sadler Health Center for high blood pressure (which was recorded at 160/120, 160/140, and 165/108), but continued to complain mainly about his gout and joint pain. (Tr. 309-10). It was noted that he had no insurance. (Tr. 310). The record indicated he had six (6) shots of vodka and twelve (12) beers the night before, but he stated his consumption of alcohol had significantly decreased. (Tr. 310).

---

9. The HealthyRx program at Sadler Health Center "was established through the generosity of the Carlisle Area Health and Wellness Foundation to help our uninsured patients as well as other uninsured patients of the community get help in obtaining the necessary life sustaining medications they need to improve their quality of life." See http://www.sadlerhealth.org/services.html.

Dr. Hieb opined that "it [was] probably gout but apparently there has never actually been an aspiration of the joint or if there was; it is a little unclear if gout crystals were ever seen." (Tr. 310). Plaintiff was in no acute distress and looked fine but had a "little bit of chronic swelling" in his right foot. (Tr. 310). Plaintiff was diagnosed with hypertension and gout, laboratory tests and joint aspiration results were requested, and he was warned of the impact alcohol has on his blood pressure. (Tr. 310).

On February 24 and 25, 2011, Plaintiff had tests and lab work done, checking, inter alia, uric acid levels, at Sadler Health Center Laboratory. (Tr. 307-08, 321-22). At this time, he was assessed as having gout from alcohol abuse. (Tr. 308) ("Gout ETOH abuse").

On May 1, 2011, Dr. Hieb conducted a "MEDICAL SOURCE STATEMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL)." (Tr. 335-38). He concluded that Plaintiff has the following exertional limitations: occasionally lift/carry twenty-five (25) pounds, frequently lift/carry twenty (20) pounds; standing or walking at least two (2) hours in an eight-hour workday; periodically alternate sitting and standing; and limited in pushing and pulling in upper and lower extremities. (Tr. 335-36). Dr. Hieb noted that Plaintiff suffered from "gout with frequent and severe flares/episodes which have made continuous[10] attendance at work difficult." (Tr. 336). Due to the "recurrent gout flares," Dr. Hieb opined that Plaintiff could occasionally ("from very little up to one third of an 8-hour day" cumulatively) perform the following: climbing, balancing, kneeling, crouching, crawling, and stooping. (Tr.

---

10. The context and few letters that the Undersigned could interpret led to a conclusion that this word in the medical record is "continuous." See (Tr. 336).

11

336). According to Dr. Hieb, Plaintiff is limited (can occasionally perform) in reaching all directions, handling, and fingering, but unlimited (frequently) in feeling. (Tr. 337). The report noted he is unlimited in seeing, hearing, and speaking because "Patient's limitations have been related to flares of his gout." (Tr. 337). Dr. Hieb also opined that exposure to temperature extremes, vibration, humidity/wetness, machinery, and heights are to be limited, but exposure to noises, dust and fumes, odors, chemicals, and gases was not to be limited because his "limitations have been because of his gout flares." (Tr. 338).

**Standard of Review**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060,

1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.

1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the RFC to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's RFC. Id. If the claimant has the RFC to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate

burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v.

Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social

Security Administration to show that the claimant is capable of performing other jobs existing in

significant numbers in the national economy, considering the claimant's age, education, work

experience, and residual functional capacity. " Id.

RFC is the individual's maximum remaining ability to do sustained work activities in an

ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61

Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time

employment and is defined as eight (8) hours a day, five (5) days per week or other similar

schedule. The RFC assessment must include a discussion of the individual's abilities. Id.; 20

C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity'

is defined as that which an individual is still able to do despite the limitations caused by his or

her impairment(s).").

**ALJ Decision**

The ALJ issued an opinion on May 17, 2011 finding the following: (1) Plaintiff has

acquired sufficient quarters of coverage to remain insured through September 30, 2011; (2)

Plaintiff had not engaged in substantial gainful activity since October 15, 2009; (3) Plaintiff has

the severe impairment of gout (20 CFR 404.1520(c) and 416.920(c)); (4) Plaintiff does not have

an impairment or combinations of impairments that meets or medically equals a listed

impairment; (5) Plaintiff has the RFC to perform light work except that he requires alternating

positions at will and can lift and carry up to twenty-five (25) pounds occasionally, in addition, he

can occasionally finger, can rarely perform bending, squatting and kneeling, and should avoid working with concentrated exposure to cold, high humidity, and avoid all exposure to vibration, moving machinery, and unprotected heights; (6) Plaintiff is unable to perform his past relevant work; (7) Plaintiff is a younger individual under the Social Security regulations; (8) Plaintiff has at least a high school education and is able to communicate in English; (9) Plaintiff is not disabled whether or not he has transferable job skills; (10) there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; and (11) Plaintiff has not been under disability as defined in the SSA from October 15, 2009 through May 17, 2011. (Tr. 12-18).

**Arguments**

In his brief, Plaintiff argues the ALJ erred by: (1) failing to address, despite giving significant weight to, the opinion of Dr. Hieb that Plaintiff would have limitations in functioning that worsen during flare-ups of his gout and make attending work difficult; (2) failing to give controlling weight to the opinion of treating physician Dr. Hieb; (3) failing to pose a complete hypothetical to the VE which included the limitations set forth by Dr. Hieb; (4) substituting her own medical opinion for that of Dr. Hieb; and (5) failing to find Plaintiff fully credible. (Doc. 13, pp. 5-6).

Plaintiff notes that Dr. Hieb, in a May 1, 2011 source statement, in addition to the limitations adopted by the ALJ, states that Plaintiff could only occasionally do certain activities and would be expected to have frequent, severe flare-ups of his gout making continued attendance at work difficult. (Doc. 13, p. 9). Specifically, Plaintiff argues the ALJ erred by failing to include Dr. Hieb's limitation to two (2) hours of standing in an eight-hour work day,

limited pushing or pulling in both upper and lower extremities, occasional climbing, balancing, crouching and crawling, and no reaching and handling. (Doc. 13, p. 14), <u>citing</u> (Tr. 335-37). Plaintiff maintains that the ALJ "made no attempt to differentiate between Plaintiff's functional limitations on a day without a flare up and his functional limitations during a day during a flare up." (Doc. 13, p. 14). Also, Plaintiff believes that the ALJ failed to consider his trouble with work attendance during his gout flare-ups. (Doc. 13, pp. 14-15).

Plaintiff argues that it is apparent from the record that the ALJ herself suffered from gout in concluding that Plaintiff would likely have gone for more treatment if his flare-ups were as severe as alleged. (Doc. 13, p. 16). Plaintiff submits the ALJ used her own medical analysis which was contrary to the treating doctor's opinion. (Doc. 13, p. 16). Plaintiff also highlights that the ALJ failed to address his testimony that he had no insurance during the questionable period of non treatment. (Doc. 13, p. 16). Plaintiff argues the ALJ improperly found him not credible based on her own medical opinion despite Plaintiff's testimony regarding his gout and its severity being supported by the opinions of Dr. Hieb and Dr. Holencik and the objective blood tests. (Doc. 13, p. 17). Based on these arguments, Plaintiff requests that the ALJ decision be reversed. (Doc. 13, p. 18).

In response, Defendant discusses the medical evidence of record: the March 6, 2010 ER visit; the March 9, 2010 ER visit; the April 27, 2010 disability examination by Mark Holenick, D.O.; the May 6, 2010 evaluation by Candelaria Legaspi, M.D.; the July 13, 2010 ER visit; the July 26, 2010 visit to Sadler Health Center; the November 2, 2010 ER visit; the November 9,

2010 evaluation by Dr. Hieb at Sandler Health Center; the January 18, 2011[11], the February 2, 2011, and the February 24, 2011 follow-up appointments with Dr. Hieb; and the May 1, 2011 Medical Source Statement by Dr. Hieb. (Doc. 14, pp. 4-10). Defendant summarizes Plaintiff's daily activities, symptoms, and complaints taken from the completed Function Report and hearing testimony. (Doc. 14, pp. 10-12). Defendant argues that substantial evidence, including medical opinion evidence, Plaintiff's longitudinal medical history, and his activities of daily living, supports the ALJ's conclusion that Plaintiff's statements could be believed and accepted as true only to the extent that they were reflected in his RFC. (Doc. 14, pp. 13-14). Further, Defendant asserts the ALJ did not substitute her own medical opinion for that of a physician, pointing out that her conclusions did not contradict Dr. Hieb's functional assessment or Dr. Legaspi's assessments. (Doc. 14, pp. 14-16 and n.3). Defendant submits that the ALJ properly rejected Dr. Holenick's opinion because it was based on Plaintiff's claim of aggressive treatment, which is not supported by the record, and because Dr. Holenick's functional limitations were contradicted by Plaintiff's own assessment of his work capacity. (Doc. 14, pp. 17-18). Overall, Defendant argues that the medical opinion evidence revealed that Plaintiff could perform the range of work proposed by the ALJ. (Doc. 14, p. 18).

Next, Defendant highlights the level of frequency of Plaintiff's treatment and failure to follow the treatment prescribed despite health coverage through the HealthyRx program. (Doc. 14, pp. 18-21) (Through HealthyRx, Plaintiff received "covered medication free and paid $5 for doctor visits, for a payment of $20 per month."), citing (Tr. 44). Defendant also notes that

---

11. In her brief, Defendant incorrectly states the date of treatment was January 8, 2011, but the records reflect the treatment was on January 18, 2011. (Tr. 312-14).

Plaintiff's ability to perform various tasks which were "an important indicator about the intensity and persistence of his symptoms, . . . showed that they were not as debilitated [sic] as he claimed." (Doc. 14, p. 22), citing 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I). Defendant argues "the weight of the evidence supports the ALJ's determination that Plaintiff's subjective complaints were credible only to the extent that they were consistent with his defined RFC." (Doc. 14, p. 22).

Defendant contends that the ALJ did pose a hypothetical to the VE that reflected each of Plaintiff's impairments that were supported by objective medical findings. (Doc. 14, p. 23). Specifically, Defendant highlights that the ALJ solicited testimony from the VE regarding Dr. Hieb's indication that Plaintiff could walk between two (2) to six (6) hours and that even if it was as Plaintiff poses, that he was restricted to two (2) hours of standing/walking and could not perform light work, he could still do sedentary work. (Doc. 14, p. 24).

Lastly, Defendant argues that the ALJ was not required to give controlling weight to Dr. Hieb's opinion regarding Plaintiff's missed work during flare-up periods because "this was not even born out by Dr. Hieb's treatment notes." (Doc. 14, p. 26), citing (Tr. 336) and (Doc. 13, pp. 13-15). Defendant contends that the record reflects Dr. Legaspi's opinion that Plaintiff's gout was treatable; and accordingly, Dr. Hieb's opinion that Plaintiff's gout flare-ups were frequent enough to prevent working should not be given "controlling" weight based on the lack of support in the medical record. (Doc. 14, p. 27). Defendant also argues that the VE indicated that even if Plaintiff missed some work he could still perform sedentary and light jobs if on average he missed no more that two (2) days per month. (Doc. 14, p. 27), citing (Tr. 86-87).

**Discussion**

The administrative record in this case is three-hundred thirty-eight (338) pages in length consisting of, underline inter alia, a hearing transcript, the ALJ decision, administrative filings, and vocational and medical records. (Doc. 10). The Court has thoroughly reviewed that record and the briefs filed by the parties. The ALJ's factual determinations are supported by substantial evidence, namely, the medical records and the testimony of the VE. The ALJ aptly cites the medical records and sufficiently sets forth her credibility determinations. (Tr. 340-345).

Plaintiff's arguments are based on two premises: (1) the ALJ erroneously did not find Plaintiff entirely credible, and (2) the ALJ inserted her own medical opinion for that of Dr. Hieb. (Doc. 13, pp. 5-8). These errors, Plaintiff argues, resulted in a hypothetical without all limitations as set forth by Dr. Hieb. (Doc. 13, pp. 8-15). Plaintiff's claims strictly focus on his gout and make no reference to his mental impairments. See (Doc. 13). Plaintiff makes no argument that he is unable to work for any other reason or any other time period but during the times of his gout flare-ups. See (Doc. 13). Accordingly, it must be determined whether substantial evidence supports the ALJ's conclusion that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Tr. 15). Significantly, Plaintiff indicated that at the time of the hearing he had a flare-up in his left hand. (Tr. 39, 72). The ALJ, who was able to observe Plaintiff at his hearing during a flare-up, determined Plaintiff's testimony regarding his symptoms is not credible. (Tr. 15).

"'[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's

demeanor and credibility.'" <u>Frazier v. Apfel</u>, 2000 U.S. Dist. LEXIS 3105, *26 ( E.D. Pa. 2000),

citing <u>Walters v. Commissioner of Social Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997); <u>Casias v.

Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ

as trier of fact, the individual optimally positioned to observe and assess witness credibility.").

The Social Security Regulations provide a framework under which a claimant's subjective

complaints are to be considered.  20 C.F.R. § 404.1529.  First, symptoms, such as pain, shortness

of breath, fatigue, <u>et cetera</u>, will only be considered to affect a claimant's ability to perform work

activities if such symptoms result from an underlying physical or mental impairment that has

been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).

Once a medically determinable impairment that results in such symptoms is found to exist, the

Commissioner must evaluate the intensity and persistence of such symptoms to determine their

impact on the claimant's ability to work.  20 C.F.R. § 404.1529(b).  In so doing, the medical

evidence of record is considered along with the claimant's statements.  20 C.F.R. § 404.1529(b).

Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the

claimant's statements:

> In general, the extent to which an individual's statements about symptoms can be
> relied upon as probative evidence in determining whether the individual is
> disabled depends on the credibility of the statements.  In basic terms, the
> credibility of an individual's statements about pain or other symptoms and their
> functional effects is the degree to which the statements can be believed and
> accepted as true.  When evaluating the credibility of an individual's statements,
> the adjudicator must consider the entire case record and give specific reasons for
> the weight given to the individual's statements.

SSR 96-7p.

21

Having reviewed all evidence of record, it is determined that substantial evidence

supports the ALJ's credibility determinations which implicitly[12] conclude that Plaintiff's

statements[13] about the frequency and severity of his flare-ups are not credible.  In determining

that Plaintiff's statements about the intensity and limiting effects of his symptoms were not

credible, the ALJ summarized the medical evidence of record and noted, among other things,

Plaintiff's medication noncompliance, the functional capacity assessments, a March 2010

radiology report, Plaintiff's continued consumption of alcohol, and Plaintiff's ability to perform

the activities of daily living and social interactions.  (Tr. 14-16).  This Court concurs that

Plaintiff's failure to follow treatment orders or take medication, despite his assertion that he was

uninsured and could not afford medication or treatment,[14] is indicative of the lack of severity of

---

12.  Plaintiff's argument that the ALJ failed to consider the amount of time he would be unable
to work during flare-ups or his difference in work capabilities during such periods is rejected.
(Doc. 13, pp. 14-15).  At the hearing, the ALJ and Plaintiff's counsel repeatedly questioned
Plaintiff about the frequency and duration of Plaintiff's flare-ups, and the VE testified
extensively regarding the number of absences an employer would excuse in a given time period.
It was the major issue of the hearing, with Plaintiff's sparse treatment coming in a close second.
Accordingly, the ALJ's vetting of the subject during the hearing, her analysis, and her opinion
that "the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these
symptoms are not credible," make it sufficiently clear that the ALJ did not believe Plaintiff's
testimony that he was incapacitated with the intensity and frequency with which he alleged and
that she did not believe that he would be unable to attend work for more than two (2) days per
month.  (Tr. 15) (emphasis added).

13.  Plaintiff testified that his gout has been getting progressively worse, and that his flare-ups
occur one (1) to three (3) times a month and last three (3) to five (5) days at a time in which
sometimes he is bedridden and sometimes he walks with a bad limp.  (Tr. 39).

14.  "In making a credibility determination, an ALJ can consider that a claimant has not sought
medical treatment for pain."  Vaneman v. Comm'r of Soc. Sec., 2009 U.S. Dist. LEXIS 59800,
*33 (D.N.J. 2009), citing Mason v. Shalala, 994 F.2d 1058, 1068 (3d Cir. 1992).  "However, the
Third Circuit has held the ALJ should not use lack of medical treatment as evidence of absence
of a disability without considering other explanations for the limited medical visits:

his symptoms. As reflected in the ALJ's questioning at the hearing, the medical records indicate

Plaintiff sought treatment for gout seven (7) times in a period of over two (2) years, and that this

level of treatment, even despite the lack of insurance, undermines Plaintiff's claim that he is

having a flare-up for three (3) to five (5) days every month or more. (Tr. 51-52). The ALJ also

properly noted Plaintiff's mass alcohol consumption. (Tr. 15) ("In February 2011, the [Plaintiff]

presented with ongoing gout and joint pain" following "having 6 shots of vodka and 12 beers the

night before."). The record supports the ALJ's reasoning that such pain would likely generate

more ER visits, likely produce more prescriptions and better medication compliance, and would

likely discourage binge drinking. See Hetley v. Colvin, 2014 U.S. Dist. LEXIS 2075, *21-22 and

n.6 (E.D. Mo. 2014) (finding that the claimant's failure to follow his doctor's advise to stop

------

> [T]he adjudicator must not draw any inferences about an individual's symptoms
> and their functional effects from a failure to seek or pursue regular medical
> treatment without first considering any explanations that the individual may
> provide, or other information in the case record, that may explain infrequent or
> irregular medical visits or failure to seek medical treatment.

Vaneman, 2009 U.S. Dist. LEXIS 59800 at * 33, citing Newell v. Comm'r of Soc. Security, 347
F.3d 541, 547 (3d Cir. 2003). Here, the ALJ notes that the records indicate medication
noncompliance since December 2009. (Tr. 15). The medical records and hearing testimony
established that Plaintiff was, no later than November 9, 2010, receiving his prescriptions and his
treatment through Sadler Health Center's HealthyRx program. (Tr. 44-45, 316) (Medical records
reflect Plaintiff can obtain prescriptions "[a]gain with the Healthy Rx."). This notation about the
lack of treatment is part of the ALJ's total analysis of the record and it is clear that her credibility
determination was not based on this single factor. Accordingly, the ALJ's failure to address the
proffered reason for noncompliance is not reversible error. See Quiver v. Colvin, 2014 U.S.
Dist. LEXIS 252207, *14-15 (W.D. Pa. 2014) ("[T]his single unsupported finding by the ALJ as
to Plaintiff's lack of medical treatment does not undermine the ALJ's otherwise supportable
credibility findings.") citing Foster v. Chater, No. 95-7049, 1995 U.S. App. LEXIS 32711 at *2
(10th Cir. 1995) (unpublished op.) ("Because the ALJ's credibility determination, here, was
otherwise supported by substantial evidence, his passing comment that plaintiff could afford
medication and physical therapy if she were to work was, at most, harmless error.").

drinking undermines his credibility), <u>citing</u> Arthritis Health Center: Gout, WebMD, available at http://arthritis.webmd.com/tc/gout-cause. (Gout flares can be brought on by the ingestion of alcohol.) Further, the medical records, including the functional assessments, do not substantiate the continued incapacitation due to flare-ups alleged by Plaintiff. Plaintiff's own testimony and appearance at the hearing during a flare-up also undermine his claims. Plaintiff testified that in 2010 there were only two (2) instances, in March and in November, at which time he was totally incapacitated requiring medical treatment. (Tr. 51). This Court defers to the ALJ's credibility determination as she was optimally positioned to observe and assess Plaintiff's credibility having seen him during a flare-up, and because the entire record supports such a determination. <u>See</u> <u>Casias</u>, 933 F.2d at 801.

Plaintiff's second argument is that the ALJ substituted her own opinion for that of Dr. Hieb. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" <u>Grogan v. Comm'r of Soc. Sec.</u>, 459 Fed. Appx. 132, 137 (3d Cir. 2012), <u>citing</u> <u>Morales v.</u> <u>Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999)). "However, '[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'" <u>Grogan</u>, 459 Fed. Appx. at 137, <u>citing</u> <u>Brown v.</u> <u>Astrue</u>, 649 F.3d 193, 197 n.2 (3d Cir. 2011). "A treating physician's opinion on the nature and severity of a claimant's impairment is only given controlling weight when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in the [claimant's] case record.'" Grogan, 459 Fed. Appx. at 137, citing Fargnoli v. Halter, 247 F.3d 34, 43 (3d Cir. 2001) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may determine, after weighing the evidence, that a treating physician's assessment should not be followed. Townsend v. Sec'y United States Dep't of HHS, 553 Fed. Appx. 166 (3d Cir. 2014), citing Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991). However, an ALJ must provide "good reasons" for discounting the treating physician's report. Townsend, 533 Fed. Appx at 166, citing 20 C.F.R. § 404.1527(c)(2); see also Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011) ("[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision.").

Plaintiff argues that it was clear from the record that the ALJ suffered from gout and entered her own medical opinion in substitution for Dr. Hieb's. (Doc. 13, p. 15), citing (Tr. 57-58). However, the ALJ is entitled to utilize, and expected to consider, her life experiences in analyzing claims. "While the ALJ [should] not of course substitute his own lay judgment for the examining doctors' medical expertise, he [is] certainly entitled to use his own experience in the weighing of evidence to sort through the various medical opinions presented en route to a reasoned conclusion." Racyson v. Barnhart, 94 Fed. Appx. 110, 113 (3d Cir. 2004), citing (reg. § 404.1527(b) to (d); Plummer, 186 F.3d at 429). Here, no error is found in the ALJ empathizing with Plaintiff during the hearing, and nowhere in the opinion does it appear that the ALJ entered her own medical opinion for that of the treating physician. Her determination of Plaintiff's limitations are in line with Dr. Hieb's assessment. Dr. Hieb limits Plaintiff's work capabilities and notes his "gout with frequent and severe flares/episodes which have made continuous

attendance at work <u>difficult</u>." (Tr. 335-338) (emphasis added). However, nowhere in the assessment does Dr. Hieb opine on the main issue on appeal: the number of days per month that Plaintiff was/will be incapacitated. Accordingly, the ALJ has not rejected the treating physician's opinion. With regards to the ALJ's credibility determinations, there is no error in her relying on her life experiences. An "ALJ has discretion 'to evaluate the credibility of a claimant and arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant.'" <u>Gantt v. Comm'r Soc. Sec.</u>, 205 Fed Appx. 65, 67 (3d Cir. 2006), <u>citing</u> <u>Brown v. Schweiker</u>, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting <u>Bolton v. Secretary of HHS</u>, 504 F. Supp. 288 (E.D.N.Y. 1980)); <u>see also</u> 20 C.F.R. § 404.1529(c)(3).

As discussed, implicit in the ALJ's conclusion to accept the testimony of the VE that there are jobs in the national economy that Plaintiff can perform and the ALJ's decision to reject Plaintiff's statements about the intensity and persistence of his flare-ups, is the conclusion that Plaintiff's injuries do not totally incapacitate him for more than two (2) days a month. <u>See</u> (Tr. 15-17); (Tr. 86) (VE testified that "[n]ormally, we say two days per month is permitted."). As noted by the VE, the standard for missed days per month is two (2) days. <u>See</u> <u>Cruz v. Colvin</u>, 2013 U.S. Dist. LEXIS 133509, *72 n.55 (M.D. Pa. 2013) (Caldwell, J.) ("Vocational experts frequently testify that missing more than 2 days per month would make an individual unemployable."). Here, there is substantial evidence in the record which supports and substantiates the conclusion that Plaintiff would not be incapacitated for more than two (2) days per month. The substantial evidence includes Plaintiff's testimony that he was totally

incapacitated requiring hospital visits on only two (2) occasions in 2010, the lack of treatment during the claimed period, and the medical records reflecting Plaintiff's noncompliance with his medicine despite its effectiveness. Further, this Court, not having seen Plaintiff testify and witness him while he was having a gout flare-up, will not interfere with the ALJ's credibility determination when the totality of the evidence of record supports a conclusion that Plaintiff's gout does not have him totally incapacitated for more than two (2) days per month. Dr. Hieb's assessment does not indicate such incapacitation, and accordingly, the ALJ's determination is not in conflict with Dr. Hieb.

## Conclusion

The Court's review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. The ALJ did not abuse her discretion in her credibility determinations and did not inject her own medical opinion for that of the treating physician. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.

A separate order will be issued.


Dated: August 27, 2014

_____
**United States District Judge**